**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CHRISTINA CROFUTT,**

        **Plaintiff,**

                                **Civil Action 2:13-cv-706**
    **vs.**                        **Judge Gregory L. Frost**
                                **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Christina Crofutt, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability Insurance Benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 21), Plaintiff's Reply (ECF No. 22), and the administrative record (ECF No. 12). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's Decision.

## I.      BACKGROUND

Plaintiff filed her application for benefits on October 2, 2009, alleging that she has been disabled since May 15, 2007, at age 41. (R. at 137-43.) Plaintiff alleges disability as a result of a back injury, which caused a lumbar sprain, radiculopathy of the left leg, degenerative disc disease, depression, anxiety, and acid reflux. (R. at 182.) Plaintiff's application for benefits was

denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative Law Judge Neil Sullivan (the "ALJ") held a video hearing on October 19, 2011, at which Plaintiff, who was represented by counsel, appeared and testified. (R. at 32-67.) Vocational Expert Lynne M. Kaufman (the "VE") also appeared and testified at the hearing. (R. at 68-83.) On November 30, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 8-21.) On May 16, 2013, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-6.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she lives in a ranch-style home with her boyfriend and adult daughter. (R. at 33.) She testified that she has a driver's license and drives about three times per week. (R. at 34.) Plaintiff also stated that she has a high school education. (*Id.*)

Plaintiff worked as a nurse's assistant. (R. at 37-40.) According to Plaintiff, she stopped working in 2007 after she sustained a back injury. Plaintiff testified that, prior to 2007, she was in good health and that she has never received unemployment compensation. (R. at 43.) Plaintiff currently receives workers' compensation benefits. (R. at 36.)

At the time of the hearing, Plaintiff testified that her condition has stayed the same since her injury. (R. at 44.) She described her back pain as constant, "but more painful at times." (R. at 45.) Plaintiff testified that she experiences muscle spasms in her back approximately four days per week. (R. at 47-48.) She also testified that she frequently uses a cane. (R. at 44.) She

explained that her left leg "goes numb and [gives] out at times" and that she has fallen several times.  (R. at 44, 46.)

Plaintiff next testified that she began seeing a psychologist, Dr. Paugh, in June 2010.  (R. at 49.)  She testified that she sees him twice per month for her depression and anxiety.  Plaintiff explained that she was "getting pretty depressed and anxious" because she was not able to do much as a result of her pain.  (*Id.*)  Plaintiff further testified that she finds it hard to focus for extended periods due to her pain and that she does not feel that she can tolerate stress or stay on task.  (R. at 58-59.)

Regarding her abilities and limitations, Plaintiff testified that she could not sit, stand, and walk for eight hours a day because of her pain and because she has "to keep [her] legs up for so long."  (R. at 54.)  Plaintiff estimated that she could walk around for 20 minutes without her cane.  (R. at 55-57.)  Plaintiff believed that during an eight hour period, she could stand or walk two hours.  (R. at 58.)  Finally, she stated that she could sit for about four hours.  (R. at 55.)  Plaintiff testified that she elevates her legs for "probably two hours" and needs to change positions every twenty minutes.  (R. at 54, 55.)

In terms of daily activities, she stated that she typically has two or three bad days per week.  (R. at 54.)  Plaintiff cooks, but it "takes [her] extra time."  (R. at 60.)  She does not wash dishes or laundry, but she performs light housekeeping and makes her bed each morning.  (R. at 60-61, 63.)  When she goes shopping, she rides in a cart.  (R. at 61.)  She testified that she does not socialize with friends as often, but does attend about three Columbus Clippers baseball games per summer.  (*Id.*)  She testified that she watches approximately two hours of television per day, reads, and spends three to four hours each day on the computer.  (*Id.*)

**B.    Vocational Expert Testimony**

The VE testified that Plaintiff's past relevant employment includes a nurse assistant, which she performed at a semi-skilled, very heavy level.  (R. at 70.)

The ALJ proposed hypotheticals to the VE about a hypothetical individual with Plaintiff's age, educational background, work experience, and residual functional capacity ("RFC") as assessed by the ALJ.  (R. at 71-78.)  The VE testified that the hypothetical individual could not perform Plaintiff's past relevant work.  (R. at 71.)  The VE testified, however, that the hypothetical individual could perform other work at the sedentary exertional level, such clerical work (1,000 jobs in the regionally economy, 140,000 nationally), a table worker (500 jobs regionally, 50,000 jobs nationally), and assembler jobs (1,000 jobs in the regional economy, and 104,000 jobs nationally).  (R. at 74-75.)

### III.    MEDICAL RECORDS

**A.    Physical Impairments**

**1.    Bureau of Workers' Compensation ("BWC")**

On May 9, 2007, Plaintiff sustained a work-related injury while working as a nursing assistant.  In attempting to prevent a patient from falling, Plaintiff twisted her back and developed an acute onset of low-back pain with radiation of pain and numbness down her left lower-limb into her foot.  (R. at 381, 413).  Plaintiff received chiropractic care (R. at 238-410), physical therapy (R. at 537-42, 544-49), and medications (R. at 560-62), as treatment.

Dr. Levey noted that a June 6, 2007 MRI of Plaintiff's lumbar spine showed degenerative disc disease with mild disc bulging at her L3-4 and L4-5 and a small central disc protrusion at her L5-S1, which was not causing significant canal or foraminal stenosis.  (R. at 406.)

4

On October 1, 2007, Plaintiff saw neurologist, Ann McLean, D.O., for a consultation. Plaintiff complained of numbness in the left leg and of her leg giving out on her. Dr. McLean assessed a normal neurological examination. Dr. McLean also performed testing and found Plaintiff's nerve conduction studies to be normal. Dr. McLean noted that Plaintiff had some mildly increased insertional activity in her left paraspinals. Dr. McLean did not believe Plaintiff's lower extremity symptoms could be substantiated by the test or by Plaintiff's MRI. (R. at 396-97.)

On December 18, 2007, plaintiff saw neurosurgeon, Joseph Shehadi, M.D., who determined Plaintiff did not need neurosurgical intervention. (R. at 390-92.)

Plaintiff attended physical therapy from March 5, 2008 through April 23, 2008. (R. at 542.) Plaintiff's physical therapist reported that Plaintiff had attended nine sessions and missed fourteen appointments. *Id.* He further reported that she was tolerating exercises and progressing with goals, but she was making questionable effort when she did attend sessions. (R. at 537, 542.) In April 2008, Plaintiff was discharged from physical therapy at her request. (R. at 542.)

On February 10, 2011, Dr. Denise David, M.D. evaluated Plaintiff as part of her workers' compensation claim. Dr. David noted that Plaintiff had not yet reached maximum medical improvement and that, due to her left-side radicular symptoms, she would benefit from further treatment. (R. at 699.) Dr. Davis also opined that plaintiff could not return to her previous work or any other work as of the date of examination. (R. at 700.)

### 2. Ralph Newman, D.O.

The record contains treatment notes from Plaintiff's primary care physician, Dr. Newman, from July 2007 through September 2011. (R. at 250-53, 525-80, 715, 735-45.) Dr.

Newman's treatment notes reflect that he treated plaintiff for her lumbosacral strain/sprain and aggravation of her lumbar radiculopathy.  (*Id.*)

On August 8, 2011, Dr. Newman completed a lumbar spine residual functional capacity questionnaire on Plaintiff's behalf.  In the questionnaire, he identified that Plaintiff suffered from pain and paresthesia and noted that both his observations from treating her and the June 2007 MRI of her lumbar spine supported his opinion that Plaintiff could walk less than a single block; sit, stand, and walk for twenty minutes at a time; sit for about four hours in an eight-hour day; and stand and walk about two hours in an eight hour day.  (R. at 731-33.)  He also opined that Plaintiff could not walk more than one block and that Plaintiff should walk every twenty minutes, for at least fifteen minutes at a time.  (R. at 732-33.)  Dr. Newman determined that Plaintiff would require a sit/stand option at work, unscheduled breaks, use of a cane, and could only occasionally lift less than ten pounds.  Dr. Newman further opined that Plaintiff could occasionally twist, stoop, and climb stairs, but could never crouch/squat or climb ladders.  He concluded that Plaintiff's impairments would cause her to miss more than four days of work per month.  (R. at 731-34.)

### 3.    Vasantha Kumar, M.D./Olentangy Pain Clinic[1]

Plaintiff began treatment with pain-management physician, Dr. Vasantha, on February 15, 2008.  Plaintiff reported that her pain is located in the lower back and is constant, sharp, throbbing, and annoying in nature.  (R. at 518.)  She also reported pain radiating down the left leg with tingling, numbness, and weakness.  *Id.*  She reported that her pain level was at 5 on a

---

[1] Both the ALJ and Plaintiff refer to Dr. Kumar as Dr. Vasantha.  Accordingly, the Undersigned refers to Dr. Kumar as Dr. Vasantha to be consistent.

scale to 10 and that it worsens with prolonged activity, bending, twisting, lifting and gets better with rest, heat, and pain medications.  *Id.*

On examination, Dr. Vasantha found no midline tenderness.  (R. at 518.)  He found that Plaintiff had mild lumbar paraspinal and moderate parasacral tenderness, as well as a myofascial spasm, without trigger points or fasciculation, in her lower back.  (R. at 519.)  He further found that Plaintiff had full motor strength in her bilateral arms and legs, deep tendon reflexes of 1 + throughout, and that her sensory was reduced to touch and pinprick sensation in her legs.  (R. at 518-19.)  He noted that Plaintiff's straight-leg raise test was negative.  (R. at 519.)  Finally, Dr. Vasantha found that Plaintiff's range of motion of the lumbar spine showed increased pain on extension and lateral rotation.  *Id.*

Dr. Vasantha assessed that Plaintiff suffered from a lumbar sprain and lumbar radiculopathy, as well as arthritis and anxiety/depression.  (R. at 519.)  Dr. Vasantha recommended that Plaintiff continue physical therapy and/or home exercises and that she take a nonsteroidal anti-inflammatory drug.  He further recommended that Plaintiff be prescribed a long-acting narcotic (e.g. duragesic) and reduce the intake of breakthrough pain medication (e.g. oxycodone).  *Id.*  He recommended that Plaintiff not use narcotics long-term and that she sign a narcotic contract and undergo random drug screens to monitor her compliance.  Finally, he recommended a trial of lumbar epidural steroid injections for pain control.  (R. at 518-19.)  Plaintiff received epidural steroid injections in August and September 2008.  (R. at 523-24.)

On June 12, 2009, Plaintiff was again treated by Dr. Vasantha.  Dr. Vasantha noted that Plaintiff had not returned for a follow-up appointment for over a year.  (R. at 516.)  During the appointment, Plaintiff complained of persistent low-back pain, which radiates down her left leg

and worsens with prolonged activity.  Plaintiff reported that her pain improved by 85% as a result of the trial lumbar epidural steroid injections the year prior.  (R. at 516.)  On physical examination, Dr. Vasantha noted that Plaintiff ambulated with a cane and had a waddling gait. *Id.*  Dr. Vasantha noted that Plaintiff had mild to moderate tenderness in her low-back and myofascial spasm in her low-back without trigger points.  *Id.*  He further noted that Plaintiff's motor strength was 5/5 in both legs and that she had deep tendon reflexes of 1+ in her legs.  Dr. Vasantha also found that her sensory was diminished to pinprick sensation and that her range of motion of her lumbar spine showed increased pain on lateral rotation.  (R. at 516-17.)

Plaintiff received epidural steroid injections again in July, September, and October of 2009.  (R. at 520-22.)

On August 27, 2010, Dr. Vasantha completed a lumbar spine residual functional capacity questionnaire on Plaintiff's behalf.  In the questionnaire, Dr. Vasantha identified Plaintiff's "chronic pain" as the "*clinical findings*, laboratory and test results that show [his] patient's medical impairments."  (R. at 691.)  In his assessment, Dr. Vasantha opined that Plaintiff could only walk one block, could sit for two hours and fifteen minutes at a time, could stand for two hours and fifteen minutes at a time, could sit less than two hours per workday, and could stand and walk less than two hours in an eight-hour workday.  (R. at 692-93.)  He further opined that Plaintiff must walk every ten to twenty minutes and that she needed a sit or stand option at work, would need unscheduled breaks, and could only occasionally lift up to ten pounds.  *Id*.  He opined that Plaintiff did not need an assistive device to balance.  *Id.*  Dr. Vasantha determined that Plaintiff could use her hands, fingers, and arms less than fifty percent of a workday and that she would miss more than four days of work per month due to her impairments.  (R. at 694.)

Finally, Dr. Vasantha opined that emotional factors contributed to the severity of the Plaintiff's functional limitations.  (R. at 691-94.)

### 4. Mark White, D.O.

On January 15, 2010, Plaintiff attended a neurosurgical spine consultation with Dr. White.  Dr. White noted, "she has been on Fentanyl Patch and Oxycodone which she states she does not use the Fentanyl patch every day but has been using it off and on for a year, which I am questioning why it is still being prescribed since it is basically not useful unless it is worn for at least 18 hours."  (R. at 616.)  Dr. White found Plaintiff had positive Waddell's signs, a normal gait, normal strength, and that she had a hyperpathic pain response.  *Id.*

Dr. White reviewed Plaintiff's thoracic spine MRI from November 2007 and opined that it was normal.  (R. at 617.)  He also reviewed her June 6, 2007 MRI and disagreed with the radiologist, finding that all of Plaintiff's discs were "pristine without degenerative changes."  *Id.* He noted that she had no bulging discs or any disc protrusion at the L5-S1 level.  *Id.*  Dr. White stated that his only finding was minimal facet disease at Plaintiff's L5-S1 and that Plaintiff had piriformis syndrome.  *Id.*  Dr. White recommended that an updated MRI be performed on Plaintiff and opined that she had severe narcotic-dependent pain syndrome.  *Id.*  Dr. White concluded that the evidence did not suggest that Plaintiff would require neurosurgical intervention, but would instead benefit from pain management and psychiatric intervention.  (R. at 616-17.)

### 5. State-Agency Evaluations

On January 19, 2010, state-agency physician Gary Hinzman, M.D. reviewed the record and assessed Plaintiff's physical functioning capacity.  (R. at 619-26.)  Dr. Hinzman opined that

Plaintiff was limited to sedentary work and could lift/carry/push and pull ten pounds both occasionally and frequently; stand and/or walk at least two hours in an eight-hour workday and sit for about six hours in a workday.  (R. at 620.)  Dr. Hinzman also found that Plaintiff could occasionally climb ramps and stairs, balance, stoop, and kneel, but never climb ladders, ropes, or scaffolds or crouch or crawl.  (R. at 621.)  Dr. Hinzman opined that Plaintiff needed to avoid moderate exposure to the use of hazardous machinery, operational control of moving machinery, and unprotected heights.  (R. at 623.)  On June 21, 2010, state-agency physician Gerald Klyop, M.D., reviewed the record and affirmed Dr. Hinzman's assessment.  (R. at 643.)

## B.    Mental Impairments

### 1.    Charles Paugh, Ph.D.

In June 2010, Plaintiff was evaluated by a psychologist, Dr. Paugh, to determine whether she has a psychological impairment as a result of her work-related injury.  Plaintiff reported to Dr. Paugh that her loss of independence has been one of the most difficult issues to deal with. She reported that she now needs help completing simple activities like going up and down steps and is no longer capable of caring for her grandchildren, which depresses her.

Plaintiff also reported that she walks her dog to keep her weight down, keeps her home clean with her children's help, watches television, uses her computer, and participates in some family activities.  (R. at 686-87.)  Dr. Paugh found that Plaintiff's concentration, attention, and thinking were marginal.  (R. at 687-88.)  He noted that she demonstrated minimal insight into her situation.  (R. at 688.)  He also noted that she did not report feelings of hopelessness or worthlessness, but did acknowledge moderate feelings of helplessness since the injury.  (R. at 687.)  Dr. Paugh diagnosed Plaintiff with an adjustment reaction, with mixed anxiety and

depressed mood, and a pain disorder.  (R. at 684-90.)

The record reflects that Dr. Paugh treated Plaintiff in February and March 2011.  (R. at 729-30.)  On May 18, 2011, Dr. Paugh completed a mental impairment questionnaire on Plaintiff's behalf.  He opined that Plaintiff would miss four or more days of work per month due to her psychological symptoms.  He found Plaintiff was markedly impaired in her ability to complete a normal workday without interruptions and in her ability to maintain attention and concentration for extended periods.  (R. at 724-25.)

On June 17, 2011, Dr. Paugh asked the BWC for a continuance of Plaintiff's psychotherapy for her adjustment disorder for six additional months, but at a reduced frequency of thirteen visits.  He noted that for over the past three months, therapy was initiated to address her symptom complaints, including periods of extreme sadness, obsessive negative rumination, disturbed sleep cycle, worrying, and crying spells.  (R. at 726.)  He further noted that Plaintiff had been fully participative and utilized a combination of verbal therapy, audiocognitive instruction, and bibliotherapy.  Dr. Paugh noted that the results were promising, but that Plaintiff reported that her symptoms have continued to persist.  *Id.*

### 2. Beal Lowe, Ph.D.

On September 17, 2010, on referral from the BWC, Plaintiff was evaluated by Dr. Lowe to determine if she is diagnosable with the conditions of adjustment reaction with mixed emotional features and a psychogenic pain disorder.  (R. at 695-97.)  After interviewing Plaintiff, Dr. Lowe noted that she presented as a friendly and emotionally stable individual.  (R. at 695.)  He noted that Plaintiff was effective and demonstrated good eye contact.  *Id.*  Dr. Lowe agreed with Dr. Paugh's diagnosis of an adjustment reaction, but concluded that Plaintiff does not have

a pain disorder because her reports of low levels of pain are "inadequate to meet diagnostic criteria." (R. at 697.)  Dr. Lowe concluded that Plaintiff should reinstitute antidepressant medication and recommended counseling. *Id.*  Plaintiff indicated that she did not feel she had a need for counseling. *Id.*

### 3.    State-Agency Evaluations

On January 21, 2010, after reviewing Plaintiff's medical records, Todd Finnerty, Psy.D., a state-agency psychologist, assessed Plaintiff's mental condition. (R. at 627-40.)  Dr. Finnerty opined that Plaintiff had mild restrictions in her activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace; with no episodes of decompensation of extended duration. (R. at 637.)  He further determined that the evidence did not establish the presence of the "C" criteria. (R. at 638.)  Dr. Finnerty determined that Plaintiff responded well to medication, that her symptoms did not cause significant limitations, and that she engaged in a wide-range of activities that did not suggest significant mental health related limitations. (R. at 639.)  Steven Meyer, Ph.D., another state-agency psychologist, reviewed the mental health records on May 5, 2010, and affirmed Dr. Finnerty's assessment. (R. at 642.)

## IV.    THE ADMINISTRATIVE DECISION

On November 30, 2011, the ALJ issued his decision. (R. at 8-21.)  Plaintiff met the insured status requirements through December 31, 2012. (R. at 13.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially

---

[2]Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

gainful activity since her alleged onset date of May 15, 2007.  *Id.*  At the second step of the

sequential evaluation process, the ALJ found that Plaintiff had the severe impairments of

disorders of the back,[3] adjustment reaction with mixed anxiety and depressed mood (chronic),

and a chronic pain disorders.  (*Id.*)  At step three, he found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled one of the listed

impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

     At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional

capacity ("RFC") and explained as follows:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform sedentary work as
> defined in 20 CFR 404.1567(a) except that she can never climb ladders, ropes or
> scaffolds, and can only occasionally climb ramps or stairs.  In addition, the
> claimant can only occasionally stoop, kneel, crouch, crawl, or balance.  The
> claimant would require the use of an assistive device to assist with balance.  The
> claimant also requires the ability to change from a sitting to a standing position
> (or vice versa) at least every hour.  Furthermore, the claimant must avoid
> concentrated exposure to extreme vibration, and moderate exposure to the use of
> hazardous machinery, operational control of moving machinery, and unprotected

---

1.     Is the claimant engaged in substantial gainful activity?
2.     Does the claimant suffer from one or more severe impairments?
3.     Do the claimant's severe impairments, alone or in combination, meet or
    equal the criteria of an impairment set forth in the Commissioner's Listing of
    Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.     Considering the claimant's residual functional capacity, can the claimant
    perform his or her past relevant work?
5.     Considering the claimant's age, education, past work experience, and residual
    functional capacity, can the claimant perform other work available in the national
    economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

    [3] The ALJ stated that Plaintiff's disorders of the back include "radiculopathy, mild
scoliosis, degenerative disc disease of the lumbar spine, disc protrusions, L5-S1 disc desiccation,
and a lumbar strain and spasm."  (R. at 13, n.1.)

heights. The claimant would also be limited to the performance of simple, routine, and repetitive tasks in a work environment where changes take place no more than occasionally and where she would have no more than occasional interaction with the general public and coworkers.

(R. at 14-15.) In reaching this determination, the ALJ assigned "partial credibility" to the opinion of Dr. Vasantha, finding that his opinions were unsupported by functional testing, based on an infrequent history of only limited treatment of Plaintiff, inadequately explained, internally inconsistent, and inconsistent with the other medical opinion evidence. (R. at 17.) The ALJ also determined that Dr. Newman's opinion was "partially credible" because Dr. Newman provided no significant discussion or rationale for his conclusions, treatment records and functional testing did not support his conclusions, his opinion was internally inconsistent, and his opinion was inconsistent with Plaintiff's own testimony regarding her ability to sit and engage in activities. (R. at 17-18.) Regarding Plaintiff's mental impairments, the ALJ gave Plaintiff "the benefit of the doubt" and gave "more weight" to Dr. Paugh's opinion than the state agency reviewing psychologists' opinions. (R. at 19.) The ALJ concluded that Dr. Paugh's treatment notes and Plaintiff's testimony did not support any additional limitations beyond those in the RFC assessment. (*Id.*) Finally, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible to the extent they are inconsistent with the RFC assessment. (R. at 19.)

At step five, the ALJ, relying on the VE's testimony, determined that Plaintiff could not perform her past relevant work. (R. at 19.) Finally, the ALJ relied on the VE's testimony to conclude that jobs exist in significant numbers in the state and national economy that Plaintiff can perform. (R. at 20.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 21.)

14

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478

F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

In her Statement of Errors, Plaintiff asserts that the ALJ failed to "follow the appropriate procedural requirements (and by doing so, arrived at an unsupported conclusion) when evaluating opinions from each of [Plaintiff's] treating physicians."  (Pl.'s Statement of Errors 7, ECF No.14.)  Specifically, Plaintiff asserts that the ALJ did not assign a proper weight or provide "good reasons" for discounting the opinions of Drs. Ralph Newman, Vasantha Kumar, and Charles Paugh.  *Id.*  For the reasons stated below, the Undersigned finds that substantial evidence supports the ALJ's decision to afford partial weight to Plaintiff's treating physicians' opinion.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique prospective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ."  20 C.F.R. § 416.927(c)(2);  *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling

weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*.  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. Apr. 28, 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, No. 09-6081, 2010 WL 3521928, at *6 (6th Cir. Aug. 31, 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

## A.  Physical Limitations

### 1.  Dr. Vasantha

In the instant action, the ALJ does not explicitly acknowledge that Dr. Vasantha, Plaintiff's pain-management physician, is a treating physician.  Nevertheless, the ALJ's analysis makes clear that he intended to designate Dr. Vasantha as a treating source,[4] as he properly considered Dr. Vasantha's opinions and provided "good reasons" for not assigning controlling weight to them.  The ALJ explained as follows:

> The Undersigned next considered Dr. Vasantha's opinion and found it partially credible.  Dr. Vasantha's opinion was only partially credible because he did not perform specific functional testing, he infrequently treated the [Plaintiff], and he stated he was not managing her medications or other impairments.  Further, he did not provide substantive explanations for many of his conclusions and some of his conclusions appeared internally inconsistent.  Specifically, Dr. Vasantha stated that the [Plaintiff] could sit for two hours and fifteen minutes at a time, could stand for two hours and fifteen minutes at a time, could sit less than two hours per workday, and could stand and walk less than two hours in an eight-hour workday.  The [ALJ] found it inconsistent that the [Plaintiff] could sit, stand, and walk in intervals longer than she could manage for the entire day.  The [ALJ] also noted that the State agency doctors opinion and Dr. Newman's opinion partially contradicted Dr. Vasantha's opinion.  Based on these factors, the [ALJ] determined that Dr. Vasantha's opinion was only partially credible to the extent that it was consistent with the residual functional capacity above.

(R. at 17.)

_____

[4]Indeed, Plaintiff even states that "[i]t can be inferred from the [ALJ's decision] that the ALJ intended to designate Dr. Vasantha as a treating physician, and that the ALJ did not find Dr. Vasantha's statements to be controlling."  (Pl.'s Statement of Errors 8, ECF No. 14.)

The Undersigned concludes that the ALJ provided legally sufficient reasons for discounting Dr. Vasantha's opinion and finding it only "partially credible" rather than controlling.  Specifically, the ALJ found that Dr. Vasantha did not perform specific functional testing to support his conclusions, nor did he provide substantive support for many of his conclusions.  *See* 20 C.F.R. § 404.1527(c)(2) (explaining that whether a treating source's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques is a relevant consideration in determining whether the treating source's opinion is entitled to controlling weight); *see also* 20 C.F.R. § 404.1527(c)(3) (identifying "supportability" as a relevant consideration).  The ALJ also found that some of Dr. Vasantha's conclusions were internally inconsistent, as well as inconsistent with the opinions of the state-agency physicians and Dr. Newman.  *See* 20 C.F.R. § 404.1527(c)(4) (identifying consistency with the record as a whole as a relevant consideration).  Finally, the ALJ found that Dr. Vasantha infrequently treated Plaintiff.  *See* 20 C.F.R. § 404.1527(c)(2)(i) (identifying the length of treatment as a relevant consideration).  These are rational grounds to discount a treating physician's opinion.

The Undersigned further finds that substantial evidence supports the ALJ's stated reasons.   First, when asked on the Residual Functional Capacity Questionnaire to identify the "*clinical findings*, laboratory and test results that show [his] patient's medical impairments," he simply listed "chronic pain."  (R. at 691.)  Thus, Dr. Vasantha failed to identify any specific clinical data or to otherwise explain his conclusions.  *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.").  Moreover, no evidence exists in the record to suggest that Dr. Vasantha conducted functional testing to support

his conclusions.  Under these circumstances, substantial evidence supports the ALJ's conclusion that Dr. Vasantha failed to provide substantive explanations for any of his conclusions and that Dr. Vasantha's conclusions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques.

Second, as the ALJ pointed out, Dr. Vasantha's opinion was internally inconsistent.  For example, Dr. Vasantha concluded that Plaintiff could sit for two hours and fifteen minutes at a time, stand for two hours and fifteen minutes at a time, but could sit less than two hours per eight-hour workday, and could stand and walk less than two hours in an eight-hour workday.  (R. at 17.)  The ALJ correctly noted that Dr. Vasantha opined that Plaintiff could "sit, stand, and walk in intervals longer than she could manage for the whole day."  *Id.*  Given these inconsistencies, the ALJ reasonably discounted Dr. Vasantha's opinions.

Further, Dr. Vasantha's treatment notes indicate that pain medications and the epidural steroid injections helped provide relief to Plaintiff.  Indeed, Plaintiff herself submitted a "Pain Clinic Follow-Up" form to Dr. Vasantha's office in which Plaintiff indicated that the injections provided an 85% benefit, with 100% being complete relief.  (R. at 665.)  Plaintiff also indicated that medications provided a 75% benefit.  *Id.*  Dr. Vasantha's opinion does not appear to account for these responses to treatment.

Substantial evidence also supports the ALJ's conclusion that Dr. Vasantha's opinions were inconsistent with the state-agency physician and Dr. Newman's opinions.  (*See* R. at 691-735, 731-34, 619-26, 643.)

In addition, the ALJ found that Dr. Vasantha infrequently treated Plaintiff.  *See* 20 C.F.R. § 404.1527(c)(2)(i) (identifying the length of treatment as a relevant consideration in

determining the weight to give a treating source's opinion).  The ALJ explained as follows:

> The claimant was treated by pain management doctors but had significant gaps in her treatment history.  A record from June 12, 2009, indicated that doctors had not treated the claimant in over a year and that the [Plaintiff] had not follow[ed] up with their prior treatment recommendations. . . . The [Plaintiff] did not return for pain management again until April 9, 2010. . . .

(R. at 15.)  The record supports the ALJ's conclusion that Dr. Vasantha was infrequently treating Plaintiff and that Plaintiff went long periods of time before returning for follow-up appointments.  *See* (R. at 663); (R. at 716-723).  Further, Dr. Vasantha indicated he had only seen Plaintiff one time per year since 2008.  (R. at 691-94.)

Finally, the Undersigned notes that Dr. Vasantha's opinion is inconsistent with other evidence in the record.  Dr. White, for example, interpreted Plaintiff's MRI as normal and noted that her discs were in "pristine" condition and were not bulging or protruding.  (R. at 394, 468, 617.)  The record also indicates that Plaintiff was possibly misusing her opiates, going lengthy periods of time before following up with Dr. Vasantha, and skipping physical therapy sessions even though Dr. Vasantha recommended that she attend physical therapy.  (R. at 16.)

Plaintiff's contention that the ALJ did not provide "good reasons" for declining to afford controlling weight to Dr. Vasantha's opinion is unavailing.  As explained above, the ALJ provided legally sufficient reasons for affording partial credibility to Dr. Vasantha's opinion, and those reasons are supported by substantial evidence.  To the extent that the ALJ did not explicitly recognize Dr. Vasantha as a treating physician or more clearly specify the weight given to his opinions, the error is harmless.  *See Wilson*, 378 F.3d at 547 (finding that harmless error may occur "where the Commissioner has met the goal of § 1527(d)(2)–the provision of the procedural safeguard of reasons–even though she has not complied with the terms of the regulation.")  The

ALJ properly provided "good reasons" for finding Dr. Vasantha's opinion to be "partially credible."  The Undersigned therefore **RECOMMENDS** that Plaintiff's contention of error related to Dr. Vasantha be **OVERRULED**.

     **2.  Dr. Newman**

     Similarly, the Undersigned concludes that while the ALJ did not explicitly acknowledge Dr. Newman as a treating physician, he did properly consider Dr. Newman's opinions and provide "good reasons" for not assigning controlling weight.  The ALJ considered Dr. Newman's opinion and found it to be "partially credible."  (R. at 18.)  The ALJ explained as follows:

> The [ALJ] next considered Dr. Newman's opinion and determined that it was only partially credible.  Dr. Newman failed to provide any significant discussion or rationale for his functional conclusions.  The [ALJ] reviewed his treating records and did not find information that would justify his conclusions or even note that he had had performed recent functional testing.  Further, Dr. Newman indicated that the [Plaintiff] could not walk more than one block but also opined in his form that the [Plaintiff] would have to be walking almost constantly throughout the day.  The [ALJ] also noted his conclusions were somewhat contrary to the [Plaintiff's] own statements and testimony, which indicated that she was able to sit for longer periods and was able to engage in more vigorous activity than would be suggested by his limitations.  For the above reasons, the [ALJ] determined that Dr. Newman's opinion was only partially credible to the extent that it was consistent with the residual functional capacity above.

*Id.*

     Here, the ALJ provided legally sufficient reasons for affording "partial credibility" to Dr. Newman's testimony.  For example, the ALJ found that Dr. Newman failed to provide any significant discussion or rationale for his opinions.  He also found that Dr. Newman's treating notes did not justify his conclusions or indicate that he had conducted any recent functional testing on Plaintiff.  *See* 20 § C.F.R. 404.1527(c)(2) (explaining that whether a treating source's

opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques is a relevant consideration in determining whether the treating source's opinion is entitled to controlling weight); *see also* 20 C.F.R. § 404.1527(c)(3) (identifying "supportability" as a relevant consideration). Finally, the ALJ found that Dr. Newman's opinions were internally inconsistent, as well as inconsistent with Plaintiff's own statements regarding her physical abilities. 20 C.F.R. § 404.1527(c)(4) (identifying consistency with the record as a whole as a relevant consideration). The Undersigned concludes that these are "good reasons" to discount a treating source's opinions.

Substantial evidence supports the ALJ's stated reasons. First, substantial evidence supports the ALJ's conclusion that Dr. Newman did not provide any significant discussion or rationale for his conclusions and that his conclusions were not supported by his treatment notes or recent functional testing. Dr. Newman indicated that he based his opinions on Plaintiff's complaints of pain and paresthesia and the June 2007 MRI of her lumbar spine. (R. at 731.) Nevertheless, Dr. Newman's treatment notes do not indicate that he conducted any recent functional testing that would support his conclusions. Again, the ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *See Buxton*, 246 F.3d at 773.

For example, Dr. Newman's treatment records do not support his conclusions. His records include reports from Dr. Vasantha, as well as Plaintiff's consulting neurologist, radiologists, and neurosurgeon. These records indicate that Plaintiff would not need neurosurgical intervention (R. at 531) and that she had some mild degenerative disc disease, but only mild abnormality in the left leg and no clear-cut radiculopathy (R. at 532). The radiologist

23

who reviewed the June 6, 2007 MRI only found mild central disc bulging at the L3-4 and L4-L5, with no extensive canal or foraminal stenosis, and a small central disc protrusion at L5-S1 not causing significant canal or formainal stenosis.  (R. at 535.)  A neurologist, Dr. McLean, noted that her nerve conduction studies were normal.  (R. at 529.)  Dr. Mclean also did not believe that her findings, or the June 6, 2007 MRI of Plaintiff's back, explain Plaintiff's lower extremity symptoms.  (R. at 529-30.)

In addition, the only clinical support Dr. Newman provides for his opinions is the June 2007 MRI.  Dr. White interpreted the June 2007 MRI and disagreed with Plaintiff's radiologist. He opined that Plaintiff's discs were "pristine" without degenerative changes.  (R. at 617, 731.) He further concluded that the MRI showed no bulging disc and no central disc protrusion at L5-S1. (R. at 617.)  Dr. White only found minimal facet disease at L5-S1 and noted that the MRI was otherwise "unremarkable."  *Id.*   An updated MRI from March 2010 reflected that Plaintiff's T11-T12 through L4-L5 disc levels demonstrated no compressive disc disease, central canal stenosis, or neuroformainal stenosis.  (R. at 661.)  The March 2010 MRI did reflect that she had L5-S1 disc desiccation with tiny central disc displacement or disc protrusion, noncompressive.[5] *Id.*  Other than the June 2007 MRI, however, Dr. Newman does not provide any additional clinical findings or treatment notes to support his conclusions.

Finally, Dr. Newman relies to some extent on Plaintiff's subjective complaints of pain, which the ALJ found were not entirely supported by substantial evidence.  As the ALJ explained:

> . . .[T]he [ALJ] found the [Plaintiff's] allegations only partially credible.   The objective medical record contained numerous instances where the [Plaintiff] was non-compliant with treatment recommendations, there were reports of positive

---

[5]In his decision, the ALJ noted that Plaintiff suffered from these severe impairments, as well as others described above, and found that they limited Plaintiff's functioning as described in the above RFC.

> Waddell's signs, and there were indications that her pain was hyperpathic.  There were also significant treatment gaps in the [Plaintiff's] treatment for pain management and her sporadic attendance with physical therapy.  The [Plaintiff's] treatment history somewhat erodes the credibility of her allegations that she is disabled.  Further, the [Plaintiff's] own statements and testimony demonstrated that she was able to engage in a range of activities of daily living.  Finally, the [ALJ] noted that the objective record contained indications that the [Plaintiff] received considerable relief from medication and treatment, but the [Plaintiff's] own statements and testimony suggested that she did not receive any of benefit from these treatments.

(R. at 19.)  Given that Plaintiff's subjective complaints are not well-supported by the objective record, the ALJ did not err in discounting Dr. Newman's opinion that was in part based on Plaintiff's subjective complaints of pain.  *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273-74 (6th Cir. 2010) (concluding that the ALJ did not err in rejecting a medical opinion based on the claimant's subjective complaints, which were not supported by objective medical evidence).

Thus, given the evidence stated above, the Undersigned concludes that substantial evidence supports the ALJ's conclusion that Dr. Newman's opinions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques or his treatment notes.

Substantial evidence also supports the ALJ's conclusion that Dr. Newman's opinion is internally inconsistent.  For example, Dr. Newman concluded that Plaintiff could stand or walk for a total of two hours per eight-hour workday and that she would need to walk every twenty minutes, for fifteen minutes each time, during an eight-hour workday.  (R. at 733.)  If Plaintiff was required to walk for at least fifteen minutes every twenty minutes, she would necessarily walk more than two hours per eight-hour workday.  Additionally, Dr. Newman's opinion that Plaintiff could not walk more than one block, but would have to walk every twenty minutes for fifteen minutes is inconsistent.  Accordingly, the ALJ rationally discounted Dr. Newman's

opinions.

The above evidence supports the ALJ's decision to discount Dr. Newman's opinions and assign them "partial credibility."  As with Dr. Vasantha, to the extent that the ALJ did not explicitly refer to Dr. Newman as a treating physician or more clearly specify the weight assigned to his opinion, the error was harmless.  The Undersigned therefore **RECOMMENDS** that Plaintiff's contention of error related to Dr. Newman be **OVERRULED**.

**B.    Mental Limitations**

**1.    Dr. Paugh**

As with Drs. Vasantha and Newman, while the ALJ did not explicitly state that Dr. Paugh was a treating source, he did properly consider Dr. Paugh's opinion and provide "good reasons" for discounting his opinion.  In evaluating the evidence in the record, the ALJ acknowledged that "the complex relationship between [Plaintiff's] mental health, pain syndromes, and physical impairments led to a significant disagreement in the medical opinion evidence regarding the extent of the [Plaintiff's] mental health limitations."  (R. at 18.)   After reviewing the evidence, the ALJ ultimately afforded "more weight" to Dr. Paugh's opinion than the state-agency psychologists' opinions.  The ALJ explained as follows:

> The [ALJ] gave more weight to Dr. Paugh's conclusions as he had the opportunity to evaluate the [Plaintiff] in person and provide a formal assessment.  His in-person evaluation is particularly beneficial given the [Plaintiff's] lack of treatment history.  However, Dr. Paugh's own treatment records did not fully support his conclusions, there was little other objective evidence that would support his conclusions, and his statements were somewhat contradicted by the claimant's own statements and testimony.  Accordingly, the [ALJ] found Dr. Paugh's assessment credible to the extent that it was consistent with the residual functional capacity above.

(R. at 19.)  The Undersigned finds the ALJ's stated reasons to be legally sufficient.  The ALJ's

26

finding that Dr. Paugh's treatment notes did not fully support his conclusions and that little other objective evidence supported his conclusion shows that the ALJ concluded that Dr. Paugh's opinion was not well-supported by the objective evidence or his own treatment notes. *See* 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 404.1527(c)(3). The ALJ also concluded that Dr. Paugh's conclusions were somewhat contradicted by Plaintiff's own statements and testimony. This finding demonstrates that the ALJ found Dr. Paugh's decision to be inconsistent with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4).

The Undersigned concludes that substantial evidence supports the ALJ's decision to discount Dr. Paugh's opinions. As the ALJ explained, "[Plaintiff's] conservative and infrequent mental health treatment" does not support Dr. Paugh's conclusions. (R. at 19.) On June 17, 2011, Dr. Paugh noted that Plaintiff should continue psychotherapy, but at a reduced frequency. (R. at 726.) Additionally, the ALJ found that "while the evidence [] certainly suggested that the claimant had ongoing mental health limitations, it also did not support Dr. Paugh's conclusions that the [Plaintiff] had marked limitations in her ability to maintain concentration or persistence." (R. at 19.) For example, Plaintiff reported to Dr. Paugh that she tries to walk her dog to keep her weight down, keeps her home clean, watches television, uses her computer, and participates in some family activities. (R. at 686.) At her hearing, Plaintiff testified that she attends Columbus Clippers baseball games and spends three to four hours per day on the computer (mostly on Facebook). (R. at 61.) This evidence also supports the ALJ's conclusion that Dr. Paugh's statements were somewhat contradicted by Plaintiff's own statements and testimony.

In addition, Dr. Paugh's opinion is not consistent with the state-agency psychologists' opinions. For example, Dr. Finnerty found that Plaintiff's affective disorder only caused "mild

27

limitations in her activities of daily living, ability to maintain social functioning, and her ability to maintain concentration, persistence, or pace." (R. at 637.) Dr. Finnerty also found that Plaintiff engaged in a wide range of activities and that the evidence does not support severe limitations. (R. at 639.) Dr. Lowe found that Plaintiff had an adjustment disorder and recommended that Plaintiff be prescribed antidepressants and obtain counseling. (R. at 697.) He noted, however, that Plaintiff indicated that "she did not feel she had a need for that service." *Id.*

As the ALJ stated, "after considering the complex nature of the [Plaintiff's] various medical conditions, [] [he] determined that the [Plaintiff] should be given the benefit of the doubt." As a result, he assigned "little" weight to the state-agency doctors' opinions and "more weight" to Dr. Paugh's opinions. As explained above, the ALJ complied with the procedural requirements of the treating source rule. The ALJ properly assigned less than controlling weight to Dr. Paugh's opinion, provided "good reasons" supported by substantial evidence for assigning less than controlling weight, and explained the weight he ultimately afforded to his opinions. Accordingly, it is **RECOMMENDED** that Plaintiff's contention as it relates to Dr. Paugh be **OVERRULED**.

## C. Plaintiff's RFC

Finally, Plaintiff's assertion that the ALJ assumed the role of a medical expert in determining Plaintiff's RFC is unavailing. Plaintiff asserts that because the gap is small between the ALJ's RFC determination and the opinion Dr. Vasantha, it is "not reasonable to suggest that the former was 'well-supported' while the latter was not."[6] A review of the ALJ's decision

---

[6]Plaintiff makes a similar argument regarding the opinions of Drs. Newman and Paugh. (*See* Plaintiff's Statement of Error 11, 12, ECF No. 14.)

reveals that he laboriously explained his reasons for assessing the above RFC. (*See* R. 13-19.) In addition to considering the Plaintiff's testimony and the objective evidence, he adequately considered and explained the weight he assessed to each medical opinion. He did not substitute the findings of Plaintiff's doctors for his own or interpret the raw medical data. Further, to the extent the ALJ added *additional* limitations based on Drs. Vasantha's and Drs. Newman's opinions, Plaintiff was not prejudiced. Accordingly, Plaintiff's contention is not well-taken.

## VII. CONCLUSION

For the reasons above, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED**, and the Commissioner of Social Security's Decision be **AFFIRMED**. (ECF No. 14.)

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation). Even when timely objections are filed, appellate

review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the

issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: February 13, 2015                                   /s/ *Elizabeth A. Preston Deavers*
                                                        Elizabeth A. Preston Deavers
                                                        United States Magistrate Judge